UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In Re:                                                    Bankruptcy No. 21-30388
                                                          Chapter 7
Christine Marie Haugen,

                          Debtor.
_____/

Christine Marie Haugen,

                          Plaintiff,              Adversary No. 21-07018

        vs.

State of North Dakota dba Bank of
North Dakota by and through Student
Loans of North Dakota,

                          Defendant.
_____/

**MEMORANDUM AND ORDER**

        On October 8, 2021, Plaintiff/Debtor Christine Marie Haugen filed this adversary

proceeding requesting the Court to discharge a student loan debt she owes to

Defendant State of North Dakota dba Bank of North Dakota by and through Student

Loans of North Dakota under 11 U.S.C. § 523(a)(8).  North Dakota filed an answer on

November 8, 2021, denying that Debtor is entitled to the relief she requests.

        The Court tried this case on August 16, 2022.  This adversary action is a core

proceeding under 28 U.S.C. § 157(b)(2)(I).  The Court has jurisdiction under 28 U.S.C.

§§ 1334 and 157, and it has authority to enter a final order in this matter.  This opinion

constitutes findings of fact and conclusions of law in accordance with Federal Rule of

Bankruptcy Procedure 7052.

1

I.    **Findings of Fact**

A.    **Background**

Debtor, who turned 39 years old in September, lives with her husband of 14

years, Travis Haugen, and their three children: daughter (11), daughter (5) and

daughter (born January 2022).  Travis Haugen works in customer service at U.S. Bank

Service Center, where he has worked for approximately 15 years.  Travis Haugen did

not petition for bankruptcy relief.

B.    **Education, Employment and Income**

After high school, Debtor attended Covenant Bible College, where she earned a

Certificate in Biblical Studies in 2003.  Next, she attended Oak Hills Christian College,

where she studied youth ministry.  She left the program before graduating because she

"didn't really like it there."  Debtor has not worked as a youth minister or obtained

employment in biblical studies since she stopped attending Oak Hills Christian College.

In 2006, she earned an Associate Degree in Legal Administration from Aakers Business

College, now known as Rasmussen University, in Fargo, North Dakota.  Although

Debtor sought employment at law firms, she maintains that the firms did not hire her

due to her lack of legal experience.

From 2012 to 2018, Debtor worked at Home Depot.  She began as a part-time

cashier and transitioned to full-time cashier within six months.  After approximately a

year and a half, Home Depot promoted her to head cashier.  Approximately a year after

the promotion, she transitioned to the Merchandising Execution Team (MET).  As a

MET member, she worked on merchandising projects like assembling seasonal displays

at the store.  Eventually, Debtor searched for other jobs hoping to earn a higher wage.

Debtor obtained employment at Integreon Management Solutions on June 20, 2018.  Debtor initially worked as a workflow coordinator earning $15 per hour.  Her duties included communicating directly with clients and coordinating the tasks of specialists/operators.  Debtor found the work too stressful and accepted a less demanding position as an operator/specialist, even though Integreon paid only $12 per hour for this work.  She reported that the job switch was "well worth it."

Debtor remains employed full time as an operator/specialist with Integreon, working approximately 40 hours per week, and she testified that she "loves it."  This position allows her to apply her legal administration education.  In this role, she completes legal document processing tasks, including PDF conversion and mail merges, prepares response documents and responds to other client requests as necessary.  Debtor currently works from 3:00 p.m. to 11:00 p.m.  She earns $13.13[1] per hour at the regular pay rate until 7:00 p.m., when her wage increases to an evening pay rate of $14.73 per hour.  Ex. 215 at 1.  Debtor testified that she works overtime if it is available, but Integreon was not offering it at the time of trial.  On occasion, Debtor becomes engrossed in her work and works several minutes past the end of her shift to complete tasks.  As a result, her pay reflects nominal overtime on these occasions.

Debtor does not receive health insurance through Integreon.  She receives health insurance benefits through Travis Haugen's employment at U.S. Bank.  When her daughter was born in January 2022, Integreon granted Debtor six weeks of paid leave, and she took an additional six weeks of unpaid leave.  Debtor used the leave she

---

[1] This wage reflects an increase Debtor received within the last few months.

3

accrued during her 12-week absence to offset the lack of compensation during the unpaid half of her maternity leave.

Debtor and Travis Haugen file their income taxes jointly as a married couple. Their tax returns from 2016 to 2021 show that their adjusted gross income totaled:

2016: $47,501

2017: $46,740

2018: $59,642

2019: $59,708

2020: $62,649

2021: $61,622

See Ex. ND-211.  The Internal Revenue Service Wage and Income Transcript for Debtor shows Debtor earned the following wages, tips, and other compensation from 2012 to 2020:

2012: $4,068

2013: $19,804

2014: $21,714

2015: $22,412

2016: $22,075

2017: $19,318

2018: $17,115

2019: $27,749

2020: $29,244

On Schedule I, Debtor reported an individual monthly net income of $2,137.92.  Ex. ND-

212 at 18.

Debtor and Travis Haugen do not anticipate any increase or decrease in income within the next year.  Ex. ND-212 at 18.  Debtor does not anticipate accepting a different job and is not looking for other work.  She testified that she may be interested in working at a law office someday, but she does not plan to apply anytime "in the near future."  Likewise, she is not interested in reassuming the position of workflow coordinator at Integreon.  According to Debtor, providing care to an infant child and two other children at home currently limits her employment possibilities.  When asked about her future employment, Debtor testified that she hopes to continue working with the same team and she hopes Integreon will promote her.  For now, she is "perfectly content" with her position.

### C.    Assets

Debtor's schedules reflect assets totaling $7,344.28 on the date she petitioned for bankruptcy relief.  Ex. ND-212 at 6.  Video games comprise the only personal property she could recall purchasing or acquiring since she filed her bankruptcy schedules.

Debtor owns no real estate.  She and her family live in a three-bedroom apartment.  They are looking for a house to buy because it is "getting very cramped" for a family of five in the apartment.

At the time she petitioned for bankruptcy relief, Debtor and Travis Haugen jointly owned two vehicles: a 2006 Saturn Ion and a 2007 Chevrolet Uplander.  Ex. 212 at 2.  Debtor values her interest in the Chevrolet Uplander at $771.  Id.  The engine in the Saturn Ion failed a few weeks before trial, and the vehicle no longer operates.  Debtor

5

and Travis Haugen do not intend to spend the money necessary to replace the engine.
For now, Debtor works from home, Travis Haugen's and Debtor's work schedules do
not overlap and none of the children attend daycare.  Consequently, Debtor and her
family plan to manage with one vehicle.

At the time she petitioned for bankruptcy relief, Debtor held an interest in four
bank accounts:

- Gate City Bank joint checking account with a balance of $579.22 (Debtor
  and Travis Haugen's "main account"),

- Postal Family Federal Credit Union joint account with a balance of $12.50
  (this account is now closed),

- Gate City Bank Money Market account with a balance of approximately
  $275.65 (the balance totaled approximately $500 at trial), and

- Gate City Bank joint checking account with a balance of $0.36.

Debtor holds a 401(k) account through her former employer, Home Depot, showing a
balance of $4,255.55 on her petition date.  She also holds a 401(k) through Integreon
with a balance of $1,401.35 as shown on her pay advice dated August 10, 2022.  Travis
Haugen borrowed against his 401k account with U.S. Bank on November 23, 2021, and
deposited $22,910 into the Haugens' joint account.  He spent $9,974.30 of this sum on
credit card debt on November 26, 2021.

Debtor and Travis Haugen received tax refunds for 2021 which they spent on
living expenses, a new mattress, box spring and two bed frames.  Bank records reflect
that the Haugens also received five deposits of $550 each from "IRS TREAS CHILD

6

CTC" and stimulus payments in the sums of $2,400 in January 2021 and $5,600 in March 2021 from IRS TREAS 310 – TAXEIP3.

### D. Liabilities and Expenses

With Travis Haugen's assistance, Debtor estimated household monthly expenses totaling $4,326.33 on Schedule J.[2]  Together Debtor and Travis Haugen earn a combined monthly net income of $4,270.44, resulting in a deficit of $55.89 per month. Ex. 212 at 18.  At trial, the Court received bank records showing that, from January 2021 to March 2022, the Haugens spent an average of over $6,000 per month on various expenses (not including the $9,974.30 credit card payment paid with funds from Travis Haugen's 401(k) account in November 2021).  These average monthly expenditures exceed the Haugens' reported net monthly income by approximately $2,000.  The Haugens' expenditures included attorney fees, large credit card payments and other expenses that do not appear to be included in the Haugens' budget or Debtor's Schedule J.  Recognizing that the Haugens' resources temporarily increased in 2021 due to stimulus payments and the advance payments for enhanced child tax credit, it is apparent that the Haugens spent considerably more than their wages can support long term.  Consequently, the Court considered only those routine expenses Debtor included in Schedule J supplemented by evidence the parties asked the Court to consider at trial and in posttrial briefing.

---

[2] Debtor explained that Travis Haugen generally assumes responsibility for the household finances, and he helped her estimate some of the household expenses.

|  | Schedule J | Other Trial Evidence |
|---|---|---|
| Rent | $920 | $925; $975 beginning in October 2022 |
| Electricity, heat, gas | $80 | |
| Cell phone, internet and cable expenses, including Verizon,[3] Amazon Prime and Disney+ | $535 | |
| Food & housekeeping | $1,000* | Approximately $1,900 for expenditures at grocery stores, restaurants, Target, Costco, Walmart, Walgreens, Bath & Body Works, MJ Capelli, Rodan + Fields[4] |
| Miscellaneous | $358*[5] | |
| Personal care products and services | $89* | |
| Childcare and children's education cost | $0 | Unreported fees for school activities |
| Clothing, laundry and dry cleaning | $259* | Approximately $180; Expenses increased after birth of daughter in January 2022, but no detail provided at trial |
| Medical and dental | $150 | Expenses increased after birth of daughter in |

---

[3] Debtor testified that her mother and a few friends are included on the Verizon family plan, but the sum she listed on Schedule J reflects the Haugens' expenses only.

[4] Bank statements received at trial reveal Debtor spent an average of approximately $1,250 per month on food purchased at grocery stores and restaurants. This $1,250 approximation does not include groceries Debtor testified the Haugens purchased at Target or Costco. To the extent Debtor spent money on miscellaneous items at retailers other than Target, Costco, Walmart and Walgreens, they are not reflected in the $1,900 total or adjusted income deficit because Debtor exceeded her planned budget of $358 per month for miscellaneous expenses at the stores listed above. As explained in the analysis, the Court views miscellaneous expenses in excess of $358 unreasonable for purposes of the section 523(a)(8) analysis in this case.

[5] Debtor originally testified that this sum, which includes items like shampoo and conditioner, is a "general figure" or "roundabout estimate" Travis Haugen suggested to Debtor when she gathered information for Schedule J. Later, she clarified that she relied on IRS standards when she listed the sum for miscellaneous expenses.

|  |  | January 2022; possible medical expenses for oldest child,[6] but no detail offered at trial |
|---|---|---|
| Transportation | $402 | $200[7] |
| Charitable contributions | $10 | $0 |
| Vehicle Insurance | $73.33 |  |
| Travis Haugen's monthly expenses | $450[8] |  |
|  |  | $89 Student loan payment for sums Debtor borrowed for her education[9] |
| **Total Expenses:** | **$4,326.33** | **$4,326.33 plus additional expenses of at least $306**** |
| **Disposable Income** | **$-55.89** | **At least $-361.89** |

\* Debtor used IRS standards to determine her estimated monthly expenses for food and housekeeping supplies, personal care products and services, clothing and miscellaneous expenses.

\*\* This figure does not include unreported school activity fees, outstanding medical bills incurred since petitioning for bankruptcy relief or increased clothing and laundry costs.

---

[6]  Debtor reported no medical issues or expenses for Travis Haugen or her at the time of trial, but their oldest daughter suffers from anxiety, and she was recently tested for attention deficit hyperactivity disorder.  In September, Debtor will learn whether her daughter requires medical treatment for ADHD and whether Debtor will incur additional expenses for this treatment.

[7] Debtor testified that the Haugens' vehicle expenses "would probably go down since we're only down to one car," and she agreed with North Dakota's counsel when he suggested the Haugens' transportation expenses would be closer to $200.

[8] Travis Haugen supplied Debtor with a "rough estimate," $450, for "Husband's monthly expenses" listed on Schedule J.  Debtor believes that $450 is the minimum payment for Travis Haugen's credit card.  Those credit card purchases include Travis Haugen's personal expenses and some household expenses.

[9] Debtor is not seeking to discharge this debt in this adversary proceeding.

On Schedule J, Debtor reported two dependents because she petitioned for bankruptcy relief before she gave birth to a baby girl in January 2022.  Debtor explained that medical, dental and household expenses, including clothing and laundry expenses, increased and will continue to increase due to the new addition to their family in January 2022.  She did not provide a specific sum.  To minimize clothing expenses, Debtor's children wear "hand-me-down" or other used clothes when possible.

Despite the fact that she and Travis Haugen support three dependent children, Debtor reported no childcare or children's education costs on Schedule J.  At trial, she explained that one of her daughters attended daycare until recently, but she will start kindergarten so the Haugens no longer use this service.  While their daughter attended daycare they paid $700 per month to the daycare provider.  Debtor testified that the Haugens fell behind on their payments and, at the time of trial, they still owed $4,000 to the daycare provider for past childcare services.  The Haugens pay "what they can" toward this outstanding debt and plan to continue the payments until they "are caught up."  Debtor also neglected to report the fees the Haugens incur for the viola they lease for their oldest daughter, who plays in the school orchestra.

The Haugen's actual expenses for food are high.  Although Debtor maintains that she often cooks for her family, the evidence shows Debtor and her family spent in excess of $8,000 at fast-food or casual dining restaurants in 2021.[10]  At trial, she conceded that spending $8,000 annually on food at restaurants is "excessive for

---

[10] Debtor and Travis Haugen's Gate City Bank joint checking account (ending in 4138) records reveal that between January 1, 2021, and March 1, 2022, they frequently made purchases at fast food restaurants like Subway or Dairy Queen and occasionally dined at restaurants like Chili's or Denny's.  See Ex. ND-213.

someone on a bare budget." Debtor explained that, particularly around the time their

daughter was born, Debtor and Travis Haugen ate at restaurants or ordered delivery

meals because they were tired. Debtor testified that she is trying to reduce this

expense by cooking and eating more often at home, yet she acknowledged that food

expenses will increase with another child.[11]

Debtor listed $0 for entertainment on Schedule J. At trial, Debtor testified that

she and her family watch movies and play video games, and she considers Amazon

Prime, Disney+ and video games their "main luxuries." Other sources of entertainment

for Debtor and her family include playing board games or video games and outings to

the park, public pool, movie theater or the zoo. They occasionally go out for ice cream.

The family does not take vacations, but approximately once per year they visit Travis

Haugen's parents at their lake home.

### E.    Educational Loans

In September 2007, Debtor's mother, Debra Jean Marchus, asked Debtor to

cosign a student loan for Marchus. At the time, Marchus was seeking a loan from the

Bank of North Dakota (BND), a state agency that administers the student loan program

for the State of North Dakota. Marchus believed she would be entitled to a lower

interest rate with a cosigner and assured Debtor that she was the responsible borrower

and would repay the loan.[12] Debtor expressed reluctance to cosign for the loan

---

[11] Debtor and Travis Haugen make most of the baby food, occasionally
purchasing fruit-based baby food if they are unable to make it.

[12] Bob Beyer, a collection and recoveries manager for the Bank of North Dakota
(BND), testified that the interest rate on student loans does not increase or decrease if a
loan is cosigned. A cosigner is typically required only when the borrower is not
creditworthy.

because she understood that it would be her responsibility to pay the loan if Marchus

failed to pay it.  Marchus "kept bugging" Debtor, and she eventually agreed to cosign

the loan.

On September 20, 2007, Debtor entered into a student loan agreement with BND

as a cosigner for Marchus.   Ex. ND-202.  On September 26, 2007, North Dakota

approved the student loan and subsequently disbursed $14,535 to Debra Marchus.

Exs. ND-203, ND-201.  North Dakota made, insured and guaranteed the loan.  Debtor

received no benefit from the student loan to Marchus.

According to Bob Beyer, a Collection and Recoveries Manager for BND, Marchus

did not make any payments on the loan while BND administered the loan.  Beyer

explained that a typical loan repayment period is ten years, but a variety of payment

options were available to Marchus, including: extended term repayment, consolidation,

deferment, forbearance and interest-only payments.  Marchus's loan was in forbearance

for a total of 22 months, and she deferred payments for a total of 68 months.  Ex. ND-

204.

BND sent Debtor annual cosigner account summaries by mail that provided the

cosigned loan balance and status of the loan.  Ex. ND-207.  The April 2016 Annual

Cosigner Account Summary shows the loan payoff increased to $26,172.33, and the

loan status reflected "deferment or forbearance."  Id.  By May 2017, the payoff grew to

$27,940.14, and the loan status indicated "repayment/delinquent."  Id.  The June 2018

Annual Cosigner Account Summary also shows a "repayment/delinquent" loan status,

but the payoff increased to $30,248.90.  Id.  Each of the account summaries reminded

Debtor that, "As cosigner, you have the same repayment obligation as the borrower and

12

are equally liable for this debt."  Id.

In addition to the Annual Cosigner Account Summary, Beyer surmised that Debtor received notice of Marchus's loan delinquencies by mail and telephone calls.  He explained that BND's practice is to send both the borrower and his or her cosigner a bimonthly written notice when his or her account is 13 to 15 days past due and also to provide notice by telephone call one or two times per month when the account is 30 days past due.  Beyer recalled speaking directly with Marchus on the telephone, but he did not recall speaking to Debtor.

In or about August 2018, BND found Marchus in default and submitted a claim for reimbursement to Student Loans of North Dakota (SLND).  Christopher Schneider, a SLND employee, explained that SLND is a North Dakota agency that guarantees all student loans for BND.  If a borrower fails to repay his or her student loan due to disability, death or default, BND may seek reimbursement for the loan, providing it meets certain conditions outlined in the claim form.  See Ex. ND-204.  If SLND accepts the claim, it assumes sole responsibility for collecting it.  SLND received BND's claim for reimbursement of the loan Debtor cosigned on August 27, 2018, presumably reimbursed BND, and assumed responsibility for collecting it.  The claim form shows the debt totaled $28,600.81 as of August 15, 2018, the date BND's "preparer" signed the form.  Ex. ND-204.  After the loan was in default, Marchus attempted to negotiate a payment plan or an additional forbearance, but SLND refused.  In January 2020, SLND initiated a lawsuit in North Dakota District Court against Marchus and Debtor, seeking a judgment on the student loan debt.  Ex. ND-217.

Debtor believes she first learned that Marchus was in default on her student loan

payments directly from Marchus.  According to Debtor, Marchus is a private person, and she was embarrassed to share this information with Debtor.  Debtor conceded that she received notices from North Dakota, but Marchus assured Debtor that she did not need to pay this debt.  Marchus told Debtor to "leave it alone" and "she'd take care of it." Debtor "took that to heart" and relied on her mother to resolve the debt.

Marchus petitioned for bankruptcy relief under Chapter 7 on June 18, 2020.  She filed an adversary proceeding seeking to discharge her student loan debt to North Dakota.  The Court found that the student loan debt imposed an undue hardship on Marchus and discharged it on May 18, 2021.  Consequently, the obligation to pay the cosigned student loan debt to North Dakota rests solely with Debtor.  The current principal balance totals $38,490.30.  Debtor has not made any payments on Marchus's student loans, maintaining that she relied on Marchus's representations that Marchus was "dealing with" North Dakota.

According to Schneider, Debtor's student loan repayment options are limited at this point. Because the loan is in default and "due in full," Debtor is not eligible for forbearance, deferment or income-contingent repayment options.  SLND will accept monthly payments of no less than those required under its 10-year repayment schedule, which equates to roughly $450 per month based on the total debt Debtor owes North Dakota.

Debtor testified that she does not earn sufficient disposable income to repay this debt.  Considering her already bare budget, Debtor testified that a payment of $450 per month would "probably almost break us."

F.    **Bankruptcy**

Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on September 7, 2021.  At trial, Debtor conceded that her primary reason for petitioning for bankruptcy relief was her inability to pay the debt to North Dakota.  After Debtor sought bankruptcy counsel, she attempted to resolve the debt.  She made settlement offers to SLND in the sums of $10,000 and $20,000.  SLND rejected the offers.

In Schedule F, Debtor listed debts totaling $142,025.97.  All of her debt is unsecured.  Student loan debt, including the $38,490.30 debt to North Dakota at issue in this adversary proceeding, comprises $134,654.26 of her total debt.  Like her debt to North Dakota, Debtor owes "Great Lakes" the sum of $82,024.12 arising from student loans granted to Marchus.  In addition, Debtor owes American Education Services $14,139.84 for student loans she borrowed for her education.  Debtor is not seeking to discharge her debt to American Education Services.  As noted in the expenses table above, she pays an income-based payment of $89 per month to American Education Services.

II.    **Conclusions of Law**

A.    **Student Loan Dischargeability Standards**

Section 523(a)(8) of the Bankruptcy Code provides that debts arising from certain educational loans or benefits may not be discharged unless "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents."  11 U.S.C. § 523(a)(8).  Unlike many other debts, a debtor's obligation to pay a student loan debt remains until a bankruptcy court expressly determines that the loan is discharged.  <u>Conway v. Nat'l Collegiate Tr.</u> (<u>In re Conway</u>), 495 B.R. 416, 419

15

(B.A.P. 8th Cir. 2013).  In other words, the exception from discharge under section 523(a)(8) is self-executing; the discharge order will not include a student loan debt unless a debtor affirmatively secures an undue hardship determination.  Id.; see also Wells v. U.S. Dep't of Educ. (In re Wells), 2020 WL 907800, at *3 (Bankr. D. Neb. Feb. 25, 2020).

The debtor bears the burden of establishing undue hardship by a preponderance of the evidence.  Kemp v. U.S. Dep't of Educ. (In re Kemp), 588 B.R. 226, 230 (B.A.P. 8th Cir. 2018); Walker v. Sallie Mae Servicing Corp. (In re Walker), 650 F.3d 1227, 1230 (8th Cir. 2011).  More specifically, the debtor bears the burden of "going forward with the evidence, and the burden of persuasion as to the outcome."  Hurst v. S. Ark. Univ. (In re Hurst), 553 B.R. 133, 140 (B.A.P. 8th Cir. 2016).  "The burden is rigorous. 'Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged.'" Educ. Credit Mgmt. Corp. v. Jesperson, 571 F.3d 775, 779 (8th Cir. 2009) (quoting Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 554-55 (8th Cir. 2003)).  While Debtor's burden is rigorous, the law does not require Debtor to demonstrate a "certainty of hopelessness," as North Dakota argues. The Eighth Circuit Court of Appeals has never adopted this standard, and the Eighth Circuit Bankruptcy Appellate Panel specifically rejected it.  See Cumberworth v. U.S. Dep't of Educ. (In re Cumberworth), 347 B.R. 652, 658 (B.A.P. 8th Cir. 2006) (rejecting the "certainty of hopelessness" and "indefinite and extraordinary hardship" standards, finding that the "totality of the circumstances test properly applied, however, is not nearly as rigid as either of these tests.").

16

In analyzing a debtor's undue hardship claim, courts examine the unique facts and circumstances of the particular bankruptcy case.  Id.; Swafford v. King (In re Swafford), 604 B.R. 46, 49 (Bankr. N.D. Iowa 2019) (citing In re Long, 322 F.3d at 554).  More specifically, in assessing whether a debtor has met her burden of proving undue hardship, courts in the Eighth Circuit apply a totality of circumstances test, under which they consider: "(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the reasonable living expenses of the debtor and her dependents; and (3) any other relevant facts and circumstances surrounding the particular bankruptcy case."  In re Walker, 650 F.3d at 1230 (citing In re Long, 322 F.3d at 554); In re Kemp, 588 B.R. at 230-31; In re Wells, 2020 WL 907800, at *4.

In analyzing the facts under the totality of the circumstances test, a bankruptcy court makes the "post-discharge undue hardship determination . . . on the basis of the facts existing at the time of trial."  In re Conway, 542 B.R. at 858 (citing Walker v. Sallie Mae Servicing Corp. (In re Walker), 427 B.R. 471, 482–84 (B.A.P. 8th Cir. 2010)).  "The bankruptcy court must make a decision based on the most reliable evidence before it." Id.

### B.    Analysis

#### 1.    Debtor's past, present and reasonably reliable future financial resources

In applying the first prong of the totality of circumstances test, the Court considers a debtor's past, present and reasonably reliable future financial resources.  In re Walker, 650 F.3d at 1230.  "A court may not engage in speculation when determining net income[.]"  Jesperson, 571 F.3d at 780 (citing Rose v. Educ. Credit Mgmt. Corp. (In re Rose), 324 B.R. 709, 712 (B.A.P. 8th Cir. 2005)).  The Court is "obligated to consider

17

not just a snapshot of her current situation but her likely future income based upon her education and employment history." Brown v. Am. Educ. Servs., Inc. (In re Brown), 378 B.R. 623, 627 (Bankr. W.D. Mo. 2007). "A debtor's attempts to obtain employment is one factor for the court to consider in determining earning capacity." Brooks v. Educ. Credit Mgmt. Corp. (In re Brooks), 406 B.R. 382, 389 (Bankr. D. Minn. 2009). In addition to a debtor's current and prospective income, courts must consider the income or earning potential of a debtor's spouse. Shadwick v. U.S. Dept. of Educ. (In re Shadwick), 341 B.R. 6, 11 (Bankr. W.D. Mo. 2006); see also In re Cumberworth 347 B.R. at 657.

A "snapshot" of Debtor's financial situation at the time of trial reveals that Debtor's assets include 401(k) accounts with balances totaling $5,656.90 and checking and money market accounts each with balances under $600. She and her husband share one operating vehicle, a 2007 Chevrolet Uplander. Debtor estimates her interest in the Uplander is $771. The Haugens also own a 2006 Saturn Ion that is no longer in working order. All Debtor's other assets are of nominal value.

From 2012 to 2020, Debtor's annual "wages, tips, and other compensation" increased from a meager $4,068 in 2012 to $29,244 in 2020, averaging $20,389 over nine years. Debtor's income increased by approximately $10,000 annually when she obtained employment at Integreon, where she uses her educational background to complete duties that include administrative legal tasks.

Debtor earns $2,137.92 per month in net income. Debtor hopes to get a promotion at Integreon and speculates that sometime in the future she may seek employment at a law office. For the foreseeable future, Debtor predicts she will

18

continue working at Integreon in her current position.  Travis Haugen earns roughly the

same wage as Debtor, and the Court received no evidence suggesting his earning

potential is likely to increase and no evidence suggesting Debtor's financial resources

are likely to increase significantly in the future.  Debtor and her husband slowly

increased their family income from $47,501 in 2016 to $61,622 in 2021.  Given the

modest increases in salary from 2018 to 2022 ($59,642; $59,708; $62,649, $61,622), it

appears that cost of living raises are likely the only income increases the Haugens will

receive.[13]  Accordingly, Debtor's past, present and reasonably reliable future financial

resources are modest.

### 2.    Reasonable and necessary living expenses

In analyzing the second prong of the totality of circumstances test, the Court

considers Debtor's reasonable and necessary living expenses to determine whether she

can afford payments on her student loans and maintain a minimal standard of living.

See In re Walker, 650 F.3d at 1234.  "A debtor is entitled to 'sufficient financial

resources to satisfy needs for food, shelter, clothing and medical treatment' to maintain

a minimal standard of living."  Piccinino v. U.S. Dep't of Educ. (In re Piccinino), 577 B.R.

560, 565 (B.A.P. 8th Cir. 2017) (quoting Nielsen v. ACS, Inc. (In re Nielsen), 473 B.R.

755, 760 (B.A.P. 8th Cir. 2012)); see also Clavell v. U.S. Dep't of Educ. (In re Clavell),

611 B.R. 504, 517 (Bankr. S.D.N.Y. 2020) (applying the stricter Brunner test, "minimal

standard of living" does not require that the debtor live in poverty).  For an expense to

---

[13] The Court declines to consider the temporary increase in resources available
to the Haugens as a result of the stimulus money and advance payments for enhanced
child tax credit in 2021 because there is no evidence that these funds will be available
to the Haugens in the future.

be reasonable and necessary, it must be "modest and commensurate with the debtor's resources." In re Conway, 495 B.R. at 422 (quoting Jesperson, 571 F.3d at 780). "[A] court may not engage in speculation when determining net income and reasonable and necessary living expenses." Jesperson, 571 F.3d at 780.

Schedule J shows that the Haugens' expenses exceed their income by $55.89. The Haugens' bank records show that, from January 2021 to March 2022, their average monthly expenditures exceeded their wages by over $2,000 per month, but not all these expenditures are routine or reasonable and necessary. The Court adjusted the Haugens' monthly expenses reported on Schedule J to reflect evidence regarding routine expenses received at trial. After making this adjustment, the Haugens' monthly expenses exceed their monthly income by at least $361.

North Dakota characterizes Debtor's testimony regarding expenses as "less than credible" and reminds the Court it "may not engage in speculation when determining . . . reasonable and necessary living expenses." Doc. 28 at 8 (quoting Jesperson, 571 F.3d at 780). For example, North Dakota highlights Debtor's testimony regarding $358 per month in miscellaneous expenses, which Debtor characterized as a "roundabout estimate" and she did not "remember exactly what I had in mind." Later, Debtor clarified that she used IRS standards when listing the $358 miscellaneous expense.

The Court agrees that Debtor's testimony regarding her expenses was sometimes vague and occasionally inconsistent with the bank statements received as evidence. Debtor's bank statements show Debtor underestimated household expenses for food and housekeeping supplies, personal care, and miscellaneous expenses by

20

more than $450 per month.[14]  See Ex. ND-213.  Additionally, the Haugens' rent had

increased by $25 at the time of trial, and it increased by another $50 in October 2022.

Finally, Debtor neglected to include her $89 monthly payment toward her student loans

on Schedule J.  Conversely, Debtor reported that her transportation expense decreased

by approximately $202 since she prepared Schedule J, and she does not routinely

contribute $10 per month to charities or religious organizations.  Likewise, Debtor's

budget for clothing exceeds her actual expenditures by approximately $79 per month.

Accordingly, after adjusting her scheduled expenses to reflect her actual expenses, her

actual monthly expenses are approximately $306 higher than her scheduled expenses.

Given the monthly deficit of -$55.89 on Schedule J, these additional expenses result in

a deficit of roughly -$361.89 per month.  See In re Walker, 650 F.3d at 1230

(recognizing that finances are relevant past the date of filing and through the adversary

proceeding); Poe v. Penn. Higher Educ. Assistance Agency (In re Poe), 354 B.R. 265

(Bankr. W.D. Mo. 2006) (adjusting scheduled expenses to reflect actual expenses).

　　In its Closing Brief, North Dakota argues that Debtor should reduce her monthly

food budget by $330 and maintains that her family should realize another $202 in

savings resulting from lower transportation expenses (reflected above) and a $700 per

month reduction in childcare expenses.  Doc. 28 at 9-10.  It suggests that these

---

[14] These expenses include only those items purchased at grocery stores,
restaurants, Target, Costco, Walmart, Walgreens, Bath & Body Works, MJ Capelli and
Rodan + Fields.  To the extent Debtor spent money on miscellaneous items at retailers
other than Target, Costco, Walmart and Walgreens, they are not reflected in the $1,900
total or adjusted deficit of $361 because Debtor's actual expenditures exceeded her
planned budget of $358 per month for miscellaneous expenses at the stores listed
above.  Under the circumstances of this case, miscellaneous expenses in excess of
$358 per month are unreasonable.

21

expense reductions leave Debtor with "no less than an additional $1,200 in disposable income" and her bank statements "prove that she has more room to tighten the belt on her expenses."  Doc. 28 at 10.  With this argument, North Dakota ignores the fact that neither Schedule J nor the additional monthly expense evidence received at trial and summarized above include a $700 monthly expense for childcare.  In other words, North Dakota invites the Court to consider a $700 cost savings that does not exist in their current budget or anticipated future budget.  North Dakota's argument also ignores Debtor's testimony that the Haugens fell behind on their payments to the daycare provider and incurred a debt in excess of $4,000 to their child's daycare provider, which they are still trying to satisfy.  This evidence does not show Debtor realized a $700 increase in disposable income after withdrawing her child from daycare; it shows Debtor could not afford to pay a daycare provider $700 per month.

North Dakota's suggestion that Debtor reduce her food budget by $330 a month is also troubling because North Dakota points to no evidentiary or legal support for this proposal.  It simply speculates that a 50% reduction in restaurant food purchases is appropriate, while reminding the Court that it "may not engage in speculation when determining net income and reasonable and necessary living expenses."  Doc. 28 at 8-9 (citing Jesperson, 571 F.3d at 780).  In Defendant's Brief in Response to Plaintiff/Debtor's Post Trial Closing Statement, North Dakota argues that Debtor should reduce her restaurant budget by $450 per month, slashing this expense by an additional $120 per month with no justification for this suggestion and no allowance for an increased grocery bill.

22

At trial, Debtor conceded that spending $8,000 annually on food at restaurants is "excessive for someone on a bare budget."  The Court agrees, but neither Debtor nor North Dakota offered evidence of what an appropriate expense reduction might be.  The Court acknowledges that reasonableness of food expenses is difficult to ascertain.[15] With the recent increases in the cost of produce and other groceries, is it less expensive to feed a family of four or five at Dairy Queen or McDonald's?  The record does not answer this question, and the Court declines to speculate or attempt to discern a specific reduction because, even if the Court considers the $330 budget reduction suggested by North Dakota, Debtor's net monthly disposable income adjusted to reflect Schedule J and evidence received at trial totals -$31.89 (-$361.89 less $330).  If the Haugen's food and restaurant budget is reduced by $450 per month, Debtor's net monthly disposable income is $88.11, nowhere near the sum necessary to pay SLND's minimum monthly payment of $450.

North Dakota also infers Debtor's $259 budget for clothing expenses and $358 budget for miscellaneous expense is "excessive" without offering evidence to show these expenses are unnecessary or unreasonable.  It also argues that the Haugens "live a life of leisure with their current budget" because they "maintain a Costco Club membership, enjoy playing video games, playing board games, viewing content of four different streaming platforms—Amazon Prime, Disney Plus, Hulu, and Nextflix, going to

---

[15] In re Brooks, 406 B.R. at 390-91 ("A survey of cases in the Eighth Circuit regarding food expenses shows a wide range of reasonableness.") (collecting cases) (finding $8.87 per person per day necessary and reasonable); Groves v. Citibank NA (In re Groves), 398 B.R. 673, 682-83 (Bankr. W.D. Mo. 2008) (finding $400 per month for food for one person reasonable); Martin v. Great Lakes Higher Educ. Group (In re Martin), 584 B.R. 886 (Bankr. N.D. Iowa 2018) (finding $1,300 per month for food and housekeeping supplies for a family of four reasonable).

the Zoo, going out for ice cream and enrolling their [daughter] in band."  Doc. 28 at 11.

Given that the Debtor and her husband maintain full-time jobs, live in a three-bedroom

apartment with three children, take no vacations other than to visit grandparents, share

a 2007 Chevrolet Uplander because they cannot afford to repair their 2006 Saturn Ion

or buy a new car, maintain staggered work schedules and Debtor works from home so

the family does not incur daycare expense, buy clothes from secondhand stores,

anticipate increased medical expenses due to their oldest daughter's anxiety and

increased costs arising from the new addition to their family, the Court is not persuaded

that the Haugens live a "life of leisure."  Where one expense might toe the line of

"necessary and reasonable," frugality in other areas is also relevant to the analysis.  In

re Swafford, 604 B.R. at 52 ("Provided that total expenses remain minimal, the debtor is

not expected or required to implement every conceivable cost-saving measure.")

(quoting Limkemann v. U.S. Dep't. of Educ. (In re Limkemann), 314 B.R. 190, 195

(Bankr. N.D. Iowa 2004)).

Debtor testified that she used IRS standards to budget for food and

housekeeping, miscellaneous expenses and personal care products and services on

Schedule J, and her bank statements demonstrate that her actual expenses exceed

these sums.  Other than restaurant expenses, SLND did not highlight any

miscellaneous expense it found unreasonable.  Debtor did not include entertainment

expenses or school activity expenses in Schedule J, although evidence at trial, including

her testimony and bank statements, shows she incurs them.  These expenses are

commonly accepted as reasonable and necessary in a section 523(a)(8) analysis.  See

In re Clavell, 611 B.R. at 517 (finding that, even under the stricter Brunner standard, a

24

debtor is not required to "forego necessary and reasonable expenses, such as healthcare expenses, food, and a modest amount of recreation and entertainment that is incident to modern life") (internal citations omitted); <u>Brown v. USA Group Loan Servs.</u> (<u>In re Brown</u>), 234 B.R. 104 (Bankr. W.D. Mo. 1999) (finding "nothing extravagant or wasteful" in Debtor's living expenses which included $150 for three sons' school supplies, lunches and activities); <u>Sweeney v. Educ. Credit Mgmt. Corp.</u> (<u>In re Sweeney</u>), 304 B.R. 360, 363 (D. Neb. 2002) ("[T]he court notes that the expenditures mentioned [including children's school activities] are common expenses that anyone with children would pay.").

Assuming that Debtor's budget for future miscellaneous expenses includes viola rental fees and other school-related expenses as well as entertainment costs like trips to the zoo and restaurants, the Court is not convinced that the $358 miscellaneous expense Debtor budgeted is unreasonable.

Debtor's actual monthly expenses on clothes total approximately $180 per month. Consequently, the Court adjusted this expense. Based on the expenditures included in the bank statements, the Court finds that $180 per month on clothes for a family of five is reasonable absent evidence to the contrary.

In summary, the evidence shows that the Haugens' scheduled expenses— adjusted to reflect the actual reasonable and necessary expenses they incur for the items budgeted—exceed their income. Even if their food budget is reduced by either $330 or $450 per month (as suggested by North Dakota), this leaves Debtor with insufficient disposable income to pay the debt to North Dakota based on the current SLND collection policies enforced by the agency.

25

### 3.     Other relevant facts and circumstances

The third prong of the totality of circumstances test requires the Court to consider

all other relevant facts or circumstances surrounding the bankruptcy case.  Bankruptcy

courts in the Eighth Circuit have considered a number of factors in analyzing the third

prong of the totality of circumstances inquiry, including:

> (1) total present and future incapacity to pay debts for reasons not within
> the control of the debtor; (2) whether the debtor has made a good faith effort
> to negotiate a deferment or forbearance of payment; (3) whether the
> hardship will be long-term; (4) whether the debtor has made payments on
> the student loan; (5) whether there is permanent or long-term disability of
> the debtor; (6) the ability of the debtor to obtain gainful employment in the
> area of the study; (7) whether the debtor has made a good faith effort to
> maximize income and minimize expenses; (8) whether the dominant
> purpose of the bankruptcy petition was to discharge the student loan; and
> (9) the ratio of student loan debt to total indebtedness.

In re Piccinino, 577 B.R. at 566.  "These numerous factors do not provide an exclusive

list of items that courts may consider and also do not require a court to address each

and every one in a particular case."  Id.  "These are mere factors for a court to consider,

and a court need not address each and every one of them, particularly where there is

no evidence, one way or the other, concerning a factor."  In re Hurst, 553 B.R. at 138.

"The purpose of this final inquiry allows a court to consider any other relevant

information that would be persuasive to overcome the income and expense analysis of

undue hardship under the first two factors of the totality of the circumstances test."  Fern

v. FedLoan Servicing (In re Fern), 563 B.R. 1, 4-5 (B.A.P. 8th Cir. 2017).

"While those factors are helpful in some cases, they have not been expressly

adopted by the Eighth Circuit as part of the totality of circumstances test, and many of

the factors are often irrelevant when applied in a particular case."  Groves v. Citibank

NA (In re Groves), 398 B.R. 673, 683 (Bankr. W.D. Mo. 2008).  Further, several of the

26

factors listed above overlap with the first two prongs of the totality of circumstances test outlined in In re Walker and In re Long and do not warrant further discussion.  Id.

In discussing the factors the Court may consider as part of the totality of circumstances, North Dakota reminds the Court that it may weigh Debtor's incapacity to pay certain debts against her if the incapacity is due to reasons within Debtor's control. See Doc. 30 at 6.  As applied to this case, the State asserts the Debtor's "alleged incapacity to service the debt due to her newborn *is* a reason within Christine's control." Doc. 30 at 6 (emphasis in original).  While claiming that North Dakota is not critical of Debtor's decision to raise a family, it highlights Debtor's testimony that her "capacity to service the debt has diminished further due to expenses associated with their newborn" and that this "state of affairs is likely to persist" and invites the Court to weigh the burden of these additional expenses against her.

The implications of this argument give the Court pause.  Is North Dakota suggesting that fundamental life choices that increase expenses after incurring student loan debt like marrying an ill dependent person, having or adopting a child, or caring for a grandchild should weigh against discharging student loan debt in bankruptcy because they are "within a Debtor's control?"  How will this affect future decisions?  North Dakota's argument raises other concerns astutely highlighted by the court in In re Mitchem:

> First, the language of § 523(a)(8) provides that an "undue hardship" determination is made by reference to both "the debtor and the debtor's dependents[.]" Thus, contrary to the Creditor's position, no mention is made in the statute that the debtor's dependent(s) be in existence at the time the student loan debt was incurred. Second, it is a fundamental principle of law that, in the absence of an overriding public concern, courts are to stay out of matters involving familial relations such as who a person may marry and how many children a person should have. See generally Seal v. Morgan,

27

229 F.3d 567, 575 (6th Cir. 2000) (fundamental rights include the right to marry, to have children, to direct the education and upbringing of one's children, and marital privacy).

Mitcham v. U.S. Dep't of Educ. (In re Mitcham), 293 B.R. 138, 147 (Bankr. N.D. Ohio 2003) (footnote omitted).

In summary, the difficulty with North Dakota's argument is that North Dakota is inviting this Court to make a judgment concerning Debtor's choice to raise a third child, rather than her spending choices at the time of petition, such as frequently eating in restaurants.  Like the bankruptcy court in In re Mitcham, the Court finds it entirely inappropriate to find or suggest that Debtor should not have elected to raise a third child or to weigh undue burden factors against her for doing so.  See id.; see also Mudd v. United States (In re Mudd), 624 B.R. 676, 691-92 (Bank. D. Neb. 2020).

Recognizing that the section 523(a)(8) analysis explores whether a student loan debt imposes an undue hardship on Debtor and all her dependents, the question is whether the circumstances of this case warrant judgment against Debtor even though she owns very few assets and her expenses routinely exceed her income.

This adversary proceeding is unlike the typical section 523(a)(8) case.  Debtor is not seeking to discharge a student loan she borrowed to attend college.  Rather, she is seeking to discharge cosigned loans disbursed to her mother that allowed her mother to attend college.[16]  As a result, some of the factors typically considered in a section

---

[16] Courts are split on the issue of whether section 523(a)(8) excepts a cosigner's liability to pay a student loan debt incurred to pay for the education of a third party. Compare Boylen v. First Nat'l Bank of Akron (In re Boylen), 29 B.R. 924, 926-27 (Bankr. N.D. Ohio 1983) (recognizing that Congress enacted section 523(a)(8) to prevent recent graduates from discharging their student loans in bankruptcy before using their education to enhance their earning power, the court found that "Congress had no intention to except a co-maker's liability on a student loan debt from discharge" and ruled that the section 523(a)(8) exception does not apply to a nonstudent comaker who

28

523(a)(8) analysis are not easily applied in this case.  For example, the factors relating

to student loan repayment and Debtor's intent to discharge debt weigh both in favor of

and against discharge.  Debtor is not seeking to discharge student loans she borrowed

for her education, and she is regularly making income-based loan payments in the sum

of $89 per month toward these loans.  Conversely, she did not make payments to North

Dakota toward the loan she cosigned for her mother, and she conceded that she

petitioned for bankruptcy relief because she could not afford to pay the debt arising from

the loans she cosigned for her mother.[17]

The import of Debtor's failure to make payments to, or negotiate a deferment or

forbearance with, North Dakota and her decision to petition for bankruptcy relief to

discharge the cosigned student loan debt are mitigated by her cosigner status,[18]

Marchus's repeated representations that she was "taking care of" the debt, and Debtor's

---

received no educational benefit from the loans) with In re Pelkowski, 990 F.2d 737, 741-45 (3rd Cir. 1993) (finding that "section 523(a)(8) applies to a co-signer of a note for the educational expenses of another person.").  The Eighth Circuit Court of Appeals has not yet ruled on this issue.  Since Debtor did not raise this issue at trial, the Court will assume, without deciding, that section 523(a)(8) applies to the cosigned student loan debt at issue.

[17] North Dakota argues that, if the dominant purpose of a bankruptcy filing is to discharge student loans, a court can assume the "Debtor funded her college education with student loans with the express intent to discharge them later in bankruptcy."  Doc. 30 at 10 (citing Lee v. Regions Bank & Student Loan Guar. Found. of Ark (In re Lee), 345 B.R. 911, 918 (Bankr. W.D. Ark 2006)).  Notably, Debtor did not fund her education with the loan at issue.

[18] At least one bankruptcy court within the Eighth Circuit has found that cosigner status is a factor in the totality of circumstances that weighs in favor of discharging the student loan obligation.  See Kinney v. Nat'l Collegiate Master Student Loan Trust I (In re Kinney) 593 B.R. 618, 624 (Bankr. N.D. Iowa 2018) ("Debtor as a cosigner received no educational benefit. This lack of educational benefit thus cuts against prohibiting discharge of the loan.").

inability to make the payments SLND demanded after the loan at issue was in default.

While it may have been prudent for Debtor to start making affordable payments toward

the cosigned debt when she first started receiving the notices warning that the loan was

in deferment, forbearance or delinquent, the Court does not find that Debtor

demonstrated bad faith or an abuse of the student loan program by failing to do so.

Although BND reminded Debtor that she was liable for the cosigned debt and warned

her that failure to pay would result in negative credit reporting, there is no evidence that

BND demanded payments from Debtor.  See Ex. ND-207.  Debtor relied on her

mother's loan management promises until BND found Marcus in default and SLND

assumed responsibility for enforcing the debt.  At that point, SLND declared the note

"due in full."  Debtor is not eligible for forbearance, deferment or income-contingent

repayment options.  Debtor proposed settlement offers to SLND, but SLND declined.[19]

SLND will accept monthly payments of no less than those required under its 10-year

repayment schedule, which equates to roughly $450 per month based on the total debt

Debtor owes SLND.  The evidence shows Debtor does not have disposable income

sufficient to make this monthly payment.  The $38,490.30 debt to North Dakota together

with its policy requiring Debtor to pay the debt to SLND in increments of no less than

$450 per month imposes an undue hardship on Debtor and her dependents.

---

[19] North Dakota argues that Debtor's settlement offers of $10,000 then $20,000
belie her claim of "undue hardship."  Debtor's offer to pay SLND—without more—does
not show that Debtor has the ability to pay her debt to North Dakota or to make a lump
sum payment of $10,000 or $20,000 to North Dakota.  To the contrary, the evidence
shows that she does not own assets sufficient to make these payments.  At most, the
settlement offers show that Debtor was willing to borrow money to pay the proposed
settlement sum or she is willing to make affordable payments toward the proposed sum.
The Court is not convinced that the offers "belie" her undue hardship claim.

North Dakota argues that Debtor could afford to pay the cosigned debt but for self-imposed limitations.  More specifically, it argues that Debtor "has not made a good faith effort to maximize her income due to her self-imposed work restrictions or her lack of effort in obtaining better employment elsewhere."  Doc. 28 at 14.

As the Eighth Circuit Court of Appeals has explained: "A debtor is not entitled to an undue hardship discharge of student loan debts when his current income is the result of self-imposed limitations, rather than lack of job skills, and he has not made payments on his student loan debt despite the ability to do so." In re Jesperson, 571 F.3d at 782 (citation omitted) (involving a lawyer who owed more than $350,000 in student loan debt and whose "record of work experience is besmirched by a patent lack of ambition, cooperation and commitment").  Underemployment is a form of self-imposed limitation.  Cases discussing underemployment often involve debtors who choose to work part time or who choose work that does not utilize their education.  See, e.g., Piccinino v. U.S. Dep't of Educ. (In re Piccinino), 577 B.R. 560, 564–65 (B.A.P. 8th Cir. 2017) (affirming bankruptcy court finding that debtor's underemployment was, to an extent, self-imposed; she did not work at all for two years, and then she worked part time as a substitute teacher during the school year and providing child care in the summer and "there is no evidence that she considered full-time employment as an option"); Sederlund v. Educ. Credit Mgmt. Corp. (In re Sederlund), 440 B.R. 168 (B.A.P. 8th Cir. 2010) (debtor with a bachelor's degree in psychology who lost many higher-paying office jobs because she "complains a lot and has been labeled a troublemaker," and who worked part time as a server in the food industry at the time she petitioned for bankruptcy relief, was not entitled to discharge of her student loan debt where the

evidence and testimony showed she was "entirely capable of obtaining full-time, gainful employment, and that she is voluntarily underemployed").

Based on the record, the Court is not convinced that Debtor is underemployed or that her lack of disposable income sufficient to pay her debt to North Dakota is due to self-imposed limitations.  This is not a case where Debtor works part time when she is capable of full-time employment or where evidence shows that she qualified for higher-paying jobs that are available to her.  Debtor obtained an Associate Degree in Legal Administration and is using this education as a full-time operator/specialist.  In this role, she completes legal document processing tasks, including PDF conversion and mail merges, prepares response documents and responds to other client requests as necessary.  North Dakota claims Debtor is an "ideal candidate for employment as a legal secretary or paralegal," but it offers no evidence to support this proposition other than Debtor's education and Debtor's testimony about her work experience, which is administrative in nature.  The Court received no evidence that Debtor is qualified for suitable jobs available in her community where the employer would either (1) accommodate her request to work from home on a modified work schedule with a salary sufficient to pay reasonable and necessary expenses and make a $450 per month payment to SLND; or (2) pay her a wage high enough to allow the family to obtain and maintain a new car, to hire a daycare provider and to make a $450 per month payment to SLND while paying all reasonable and necessary expenses.

Likewise, the Court is not convinced that Debtor's decision to resign as a workflow coordinator at Integreon because it was stressful and forgo applying for higher-paying shifts or positions at Integreon is a self-imposed restriction showing that

she is failing to maximize her income.  Debtor is working full time for an employer that

allows her to work from home on a work schedule that allows her to accommodate her

family's needs.  She testified that she works overtime if it is available.  While it is true

that Debtor accepted $3 less per hour to work as an operator/specialist, she has since

received small raises nearly sufficient to recoup this wage loss.  The Court received no

evidence that she is qualified for higher-paying positions available at Integreon where

she could maintain her current work schedule and ability to work from home.  Further,

any purported lack of ambition is offset by transportation and daycare savings as well as

her husband's contribution to the family finances on which she relies to pay her student

loan debts and all the other reasonable and necessary expenses.

In summary, the limited trial evidence presents the Court with a difficult decision.

Debtor is only 39 years old with many years left in her career.  She is in good health

with no disabilities and a consistent job history.  Although unlikely, it is possible she

could earn wages higher than the Court anticipates.  It is also possible that the Haugens

may be forced to buy a second vehicle and/or repair or replace the 2007 Chevrolet

Uplander or they may find a suitable house to purchase, which may significantly

increase their expenses.  If SLND's policies would allow it to offer Debtor an income-

based repayment option, the outcome of this case may be different.  Based on the

evidence it received, however, the Court finds that the $38,490.30 debt to North Dakota

together with its policy requiring Debtor to pay the debt to SLND in increments of no

less than $450 per month for the next 10 years imposes an undue hardship on Debtor

and her dependents under 11 U.S.C. § 523(a)(8).

### III.      Conclusion

The Court considered all other arguments and deems them to be without merit or unnecessary to discuss. For the reasons stated above, the Court finds in favor of Debtor and against the State of North Dakota.  Debtor's obligation to pay the student loan debt owed to North Dakota is discharged under 11 U.S.C. § 523(a)(8).

Dated:  October 3, 2022.

_Shon Hastings_

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT